IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Vernon L. Traster,                                     Case No. 3:13 CV 1323

                                   Plaintiff,          MEMORANDUM
                                                       OPINION AND ORDER
                  -vs-
                                                       JUDGE JACK ZOUHARY
Ohio Northern University,

                                   Defendant.

## INTRODUCTION

Defendant Ohio Northern University ("ONU") terminated Plaintiff Vernon Traster, a tenured law professor, in 2013 following allegations he sexually harassed a law student and Law School employee.  Traster claims he was denied the dismissal process spelled out in his employment contract, while ONU argues he received the process to which he was entitled.  Following a bench trial (8/03/15 Dkt. Entry.) and review of the post-trial submissions (Docs. 69 & 70), this Court agrees with ONU.

## FINDINGS OF FACT

Traster received annual continuing appointment letters from ONU, explaining his "[e]mployment pursuant to this appointment is subject to the rules, regulations, and personnel policies of the University" (PX 1 at 1; *see also* PX 2 at 1).[1]  This catch-all "applicable-rules" phrase generally includes the ONU Handbook (PX 7), as well as the Bylaws of the ONU Claude W. Pettit College of Law (PX 5; *see also* Tr. at 53–54).  Both policies refer to faculty dismissal procedures.

-------

[1]

      Pincites to trial exhibits refer to the exhibit's native pagination.  All other record citation pincites refer to ECF pagination.

*Handbook Provisions*.  Under the Handbook, "[t]enure is the right to appointment on a continuing basis until the faculty member resigns, retires, or is separated from the University for adequate cause in accordance with the procedures set forth herein or hereafter defined" (PX 7 at 18 (§ 2.4(1))).  The University Administration "has the right to discipline faculty members for just cause," with penalties ranging from "oral reprimand to immediate discharge" (*id*. at 31 (§ 2.10)).  However, a faculty member targeted for discharge is "permitted the recourse provided in Dismissal in th[e] Handbook as the exclusive remedy" (*id.*).

Section 2.10's reference to "Dismissal" means the detailed procedures of Section 2.7, "Dismissal of Faculty Member" (*id*. at 25).  Section 2.7 allows dismissal "only for adequate cause," and provides examples of "[c]auses that warrant such dismissal," including "grave misconduct" (*id*. (§ 2.7(1)).  A violation of ONU's sexual harassment policy is grounds for dismissal (*id*. at 49 (§ 2.25(5)(D))).

"When the issue of dismissal for cause arises," Section 2.7 is triggered, beginning with an informal conference between the faculty member and the relevant college dean which, if unsuccessful, leads to referral to "a standing or ad hoc committee of five faculty members elected by the faculty and charged with the function of rendering confidential advice to both parties in such situations" (*id*. at 25 (§ 2.7(2))).  ONU's President considers the review committee's report to determine if "dismissal proceedings shall be undertaken" (*id.*).  If the President decides such "formal proceedings shall be initiated," he or she explains to the faculty member the basis for the charge (*id*. at 26 (§ 2.7(3))).  ONU may suspend a faculty member during termination proceedings "only if immediate harm to the faculty member, to others, or the instructional program of [ONU] is threatened by the faculty member's continuance" (*id*. at 27 (§ 2.7(14))).

2

Proceedings then shift to the hearing committee. "A committee of five full-time faculty members," elected by the University Faculty, "conduct[s] the hearing and render[s] a decision" regarding "whether or not the faculty member should be removed from the faculty position held on the grounds stated" in the President's charge (*id.* at 26 (§ 2.7(3)–(4)); *see also id.* at 151–52 (membership of review and hearing committees, respectively)). The Handbook includes extensive procedural protections (*id.* at 26–27 (§ 2.7(4)–(9))). The hearing committee must make "explicit findings" whether dismissal is appropriate (*id.* at 27 (§ 2.7(10))), and the University bears a preponderance-of-the-evidence burden of proof (*id.* at 26 (§ 2.7(7))). After the hearing committee reaches a decision, the President sends the committee's report to the ONU Board of Trustees, which can sustain or overrule the committee (*id.* at 27 (§ 2.7(12))).

*Law School Bylaws*. The Bylaws establish rules that "are the exclusive means of making hiring, retention, promotion[,] and tenure decisions" at the Law School (PX 5 at 2 (Bylaw I(A))). Bylaw III, titled "Retention," explains how the Law School retains non-tenured faculty (*see id.* at 12 (Bylaw III(A)(1))). Bylaw III also provides that "[d]ismissal of tenured faculty shall not occur except pursuant to AAUP, ABA, and AALS guidelines" (*id.* at 13 (Bylaw III(A)(2))). The AAUP's Regulations describe in detail dismissal procedures for faculty members (PX 6 at 65–67), while the ABA Standards provide similar recommended procedures, albeit in briefer form (DX 33 & 34). The AALS guidelines only condition AALS membership on a law school maintaining "academic freedom and tenure in accordance with the principles of the" AAUP. *Traster v. Ohio Northern Univ.*, Case No. 3:12-cv-02966, Doc. 1-3 at 277 (N.D. Ohio 2012).

*The Disputes*. The parties generally agree that the applicable rules referenced in Traster's appointment letter incorporate into Traster's employment contract both the Handbook and Bylaws

3

(Doc. 56 at 3), but they disagree about whether the Bylaws have any application to dismissal proceedings and, if so, what the Bylaws require of the University.

Traster emphasizes six differences between the Handbook and the Bylaws. The existence of these differences is premised on Traster's assumption that the Bylaw's reference to the AAUP Regulations incorporates every aspect of the AAUP-recommended process into the Law School dismissal process. Here is how Traster frames those differences (*see* Doc. 70 at 6):

- The Regulations require a university to consult with "the Faculty Committee on Academic Freedom and Tenure" regarding the terms of suspension pending dismissal proceedings (PX 6 at 65–66 (§ 5(c)(1))), while the Handbook vests suspension authority in the President alone (PX 7 at 27 (§ 2.7(14))).

- The Regulations prohibit suspension without pay (PX 6 at 65–66 (§ 5(c)(1))), while the Handbook is silent on the subject.

- The Regulations "[p]rovide[] a right to a hearing before the Law School Tenure Committee," which Traster contends is "the elected faculty hearing committee" referenced in the Regulations (Doc. 70 at 6 (quoting PX 6 at 65 (§ 5(c))), while the Handbook assigns the hearing task to a standing Hearing Committee on the Dismissal of Faculty, staffed by five faculty members from departments across the University (PX 7 at 26 (§ 2.7(4)); *see also id.* at 151–52).

- The Regulations allow the faculty member two peremptory strikes of hearing committee members (PX 6 at 65 (§ 5(c))), while the Handbook provides a single strike (PX 7 at 26 (§ 2.7(4))).

- The Regulations do not limit the faculty member's attorney's role at the dismissal hearing (PX 6 at 66 (§ 5(c)(5))), while the Handbook does (PX 7 at 27 (§ 2.7(9))).

- The Regulations require the university to show adequate cause for dismissal by clear-and-convincing evidence (PX 6 at 66 (§ 5(c)(8))), while the Handbook requires only a preponderance showing (PX 7 at 26 (§ 2.7(7))).

The process owed Traster during dismissal proceedings is the key point of contention between the parties, but they further dispute the authority ONU relied on to suspend Traster pending termination proceedings. ONU contends it used Section 2.10's general disciplinary authority (*see*

4

Doc. 69 at 6–7).  Traster argues ONU used Section 2.7(14), but breached his employment contract by failing to make a finding that Traster's presence on campus pending the outcome of dismissal proceedings posed an immediate harm to ONU or a community member (*see* Doc. 70 at 2–4).

### STANDARD OF REVIEW

In construing Traster's employment contract, this Court's role is to "give effect to the intent of the parties," looking first to the contract as a whole and presuming the parties manifested their intent through "the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement." *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 129 Ohio St. 3d 397, 404 (2011).  "Where one instrument incorporates another by reference, both must be read together." *Christe v. GMS Mgmt. Co.*, 124 Ohio App. 3d 84, 88 (1997). "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Sunoco, Inc. (R & M)*, 129 Ohio St. 3d at 404 (quotation marks omitted).

A contract is ambiguous, however, if it contains conflicting provisions, *see Fairmont Creamery Co. v. Ewing,* 43 Ohio App. 191, 196 (1932), or terms that are "so broad and vague as to require reference outside the instrument in order to comprehend [their] meaning," *Stony's Trucking Co. v. Pub. Utils. Comm'n*, 32 Ohio St. 2d 139, 142 (1972).  "[W]here the language of a contract is of doubtful import, it is proper to ascertain the circumstances which surrounded the parties at the time it was made, the object intended to be accomplished, and the construction which the acts of the parties show they gave to their agreement, in order to give proper construction to the words they have used in the instrument, and to determine its legal effect." *Blosser v. Carter*, 67 Ohio App. 3d 215, 219 (1990) (quotation marks and emphasis omitted). "No provision of a contract [should] be disregarded as inconsistent with other provisions, unless no other reasonable construction is possible." *Broad St. Energy Co. v. Endeavor Ohio, LLC*, 975 F. Supp. 2d 878, 884 (S.D. Ohio 2013) (quotation marks

omitted). Traster bears the burden to prove each element of his contract claim by a preponderance of the evidence. *See Cooper & Pachell v. Haslage*, 142 Ohio App. 3d 704, 707 (2001).

CONCLUSIONS OF LAW

**ONU did not Breach Traster's Employment Contract by Applying the Handbook**

After careful review of the employment contract text and structure, the context in which it was adopted, the purpose for its adoption, and past practice at the University, this Court concludes Traster's employment contract entitled him to the process outlined in the Handbook. Law School Bylaw provisions that reference the "retention" of law school faculty refer to the process of either granting tenure or renewing term contracts. And the Bylaw statement that "[d]ismissal of tenured faculty shall not occur except pursuant to AAUP, ABA, and AALS guidelines" (PX 5 at 13 (Bylaw III(A)(2))) means the disciplinary procedures adopted by ONU must be consistent with these educational associations' standards, which themselves are only recommendations. This "pursuant-to" clause does not wholesale adopt these standards as the dismissal procedure that applies to tenured law faculty. The Handbook dismissal provisions are consistent with these recommended guidelines. Because a reasonable reading can be given to both Handbook Section 2.7 and Bylaw III(A)(2), this Court rejects Traster's request to substitute, in full, the AAUP Regulations for ONU's generally applicable dismissal provisions.

*Text and Structure*. Dictionary definitions help set the ordinary meaning of contract language. *See Sunoco, Inc. (R & M)*, 129 Ohio St. 3d at 404. With the exception of a narrow dispute over the meaning of Sections 2.7(14) and 2.10, neither party disputes the meaning of language used in Section 2.7. Rather, the parties dispute what the Bylaws mean when they state that tenured faculty "shall not [be dismissed] except pursuant to AAUP, ABA, and AALS guidelines" (PX 5 at 13 (Bylaw III(A)(2))).

6

"Pursuant to" means "[i]n compliance with," "in accordance with," or "under" some other provision or authority. BLACK'S LAW DICTIONARY 1431 (10th ed. 2014); *see also* WEBSTER'S II NEW COLLEGE DICTIONARY 900 ("In accordance with"). That phrase could reasonably mean that a tenured law faculty member can be dismissed only if ONU uses the procedures specified in the relevant guidelines. But the same phrase could mean that a tenured faculty member can be dismissed if ONU's dismissal procedures are "in accordance" with, or consistent with, the referenced guidelines, not that ONU's dismissal procedures must be in all particulars identical with the guidelines.

Structure confirms that, when the law faculty adopted the pursuant-to clause, it sought to endorse the referenced guidelines as a basis for disciplining faculty who otherwise have continuing appointments, not to adopt those provisions wholesale. *See Marusa v. Erie Ins. Co.*, 136 Ohio St. 3d 118, 120 (2013) ("The meaning of a contract is to be gathered from a consideration of all its parts . . . ." (quotation marks omitted)). The law faculty established the Bylaws as the "exclusive means for making hiring, retention, promotion[,] and tenure decisions" at the Law School (PX 5 at 2 (Bylaw 1(A))). The law faculty did not purport to establish exclusive rules for disciplining its own members.

The Bylaws' structure, unchanged since Traster joined the faculty (*compare id.*, *with* DX 32), follows that limited purpose. Bylaw II, titled "Hiring," establishes criteria for filling positions and assigns recruitment roles (PX 5 at 8–11). Bylaw III, titled "Retention," explains the basis for retaining non-tenured faculty and other Law School staff (*id.* at 12–14). Bylaw IV, titled "Promotion," establishes how Law School employees advance in their careers (*id.* at 15–21). Bylaw V sets tenure standards and explains the basis for renewing the four-year contracts held by certain non-tenured employees (*id.* at 22–25). Bylaw VI spells out faculty evaluations (*id.* at 26–27).

The sole reference to dismissal standards for tenured law faculty does not appear in a separate Bylaw dealing with tenured faculty dismissal, as one would expect of such an important topic.

7

Rather, the reference appears in Bylaw III, in a single-sentence subsection that follows a page-long discussion of how the Law School retains -- not how it disciplines -- non-tenured law faculty. "Retention" in this sense means that non-tenured faculty and law librarians, legal writing instructors, and law clinic instructors undergo regular evaluation and are retained if they meet performance goals (*id.* at 12 (Bylaw III(A)(b))).  By contrast, tenured faculty receive continuing appointments that do not depend on the Tenure Committee's assessment of the faculty member's performance (*see, e.g.*, PX 7 at 18 (§ 2.4(1))).  The closest parallel to the non-tenured-faculty retention provision would therefore be a tenured-faculty provision that reasonably is read to mean such an appointment continues except upon dismissal proceedings, held according to policies that are consistent with recommendations of the AAUP, the ABA, and AALS.  That is what the pursuant-to clause does.

Had the law faculty intended itself be the arbiter of tenured law professor dismissal, it would have created some body tasked with serving that role.  Traster argues the Tenure Committee serves as the hearing committee, but that contention fails for two reasons.

First, not even the AAUP Regulations charge a faculty tenure committee with overseeing dismissal proceedings.  Rather, the Regulations assign that responsibility to "the elected faculty hearing committee" (PX 6 at 65 (§ 5(c))).  When the AAUP Regulations assign a task to a faculty tenure committee, they do so expressly: the Regulations suggest having a tenure committee advise the administration on suspending a faculty member prior to the conclusion of termination proceedings (*id.* at 66 (§ 5(c)(1))).  Traster's reading wipes away the AAUP Regulation's careful distinction between the tenure and hearing committees.

Second, under the Law School Constitution, the Tenure Committee's role is limited to "questions of retention, promotion, and tenure as specified in the [Law School] bylaws" (PX 3 at 6 (Art. I, § 4(A)(5)); *see also* PX 4 at 3 (Art. I, § 4(A)(5)–(6)) (1984 Constitution, assigning to the

8

Tenure Committee "questions of tenure as specified in the bylaws," and retention and promotion questions to a now-defunct Retention-Promotion Committee)). If the law faculty also intended the Tenure Committee to hold quasi-judicial proceedings to decide if adequate cause exists to terminate a tenured law faculty member, it would have said so. In a related context, where the Law School acts pursuant to a delegation from ONU (PX 7 at 158), the law faculty set forth with great particularity the process owed a law student charged with violating the student code of conduct (PX 20 at 13–20), including the faculty's role in the adjudicatory process.

Finally, reading the pursuant-to clause as serving a dual function -- describing the basis for continuing a tenured faculty member's appointment, and endorsing recommended guidelines for University-wide dismissal procedures -- gives meaning to key portions of the Handbook, including the statements that a faculty member facing discharge "will be permitted the recourse provided" in Section 2.7 "as the exclusive remedy" (PX 7 at 31 (§ 2.10)). Traster's reading renders these provisions meaningless, at least with respect to tenured law faculty. And it creates a strange result, affording tenured law faculty more process during dismissal proceedings than their tenure-track or non-tenured colleagues. After all, the pursuant-to clause appears in a section that references tenured law faculty only. Setting aside the oddity of having two different dismissal procedures apply to the faculty of the same college, Traster's reading offers less process to the very faculty members who presumably most need robust academic-freedom protections: younger, less-established professors, who bid for increasingly scarce law school faculty appointments and tenure by publishing in new, unique areas of the law. The law faculty would not have intended such results.

*Context*. The pursuant-to clause cannot reasonably be construed without reading that clause in the context of the law faculty's authority and place within the University structure. As that structure shows, the law faculty's authority to adopt, on its own, dismissal processes that apply to

tenured law faculty is doubtful as best.  A reasonable reading of the pursuant-to clause should not impute to the law faculty a power it likely does not possess, yet that is just what Traster's reading would do.

The Law School is not an autonomous institution; it is one of ONU's five constituent colleges, and its tenured faculty are employed by ONU, not the Law School (Tr. at 30).  Three key entities comprise the University: the Board of Trustees, the University Faculty, and the college faculties.  "The Faculty of the University," not the faculty of any one college, is primarily tasked under the Faculty Constitution with "making policy recommendations concerning academic matters and . . . the general welfare of the University" to the ONU Board of Trustees, which has power to establish University policy (PX 7 at 129 (Art. III, § 1)).  A college faculty "has the authority of the Faculty of the University in matters which affect it alone, providing that its actions shall not conflict with the policies or rules of the University" (*id*. (Art. III, § 2)).  Faculty and college-specific constitutions and bylaws delineate the roles of these entities, but Traster identifies nothing in this governmental structure that suggests the law faculty may, on its own, design dismissal procedures that apply to itself.

Traster apparently looks first to Article III of the Faculty Constitution, which in general terms assigns authority to the University Faculty, and partially delegates that authority to the college faculties.  The design of dismissal procedures does not fall within the scope of the college faculty's delegated authority for at least two reasons.

First, a procedure governing how tenured faculty may be disciplined is not a matter that affects a single college.  How a college treats allegations of sexual harassment can have a much broader impact on the university, including (to name a few) negative publicity and government enforcement

10

or private civil lawsuits filed under Title IX or its implied right of action.  *See, e.g.*, 20 U.S.C. § 1682; *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979).

Moreover, while the alleged sexual harassment in this case involved a Law School professor, and Law School employee and Law School student, what if the harassment involved people from different colleges?  Would each be entitled to a different procedure?  Of course not.  There is a single disciplinary procedure, not focused on the tenure requirements of each college, but intended to apply campus-wide.

Second, even if the law faculty's delegated authority extended to such matters, that delegated authority would not include authority to act without the Board's approval.  The University Faculty only may recommend important policy changes to the Board.  The law faculty would have that same power, and Traster provides no evidence that the Board approved a Law School-designed dismissal process.  What the University has done, however, is (1) adopt disciplinary procedures that purport to apply across the University and (2) direct colleges to adopt policies centering on "promotion, tenure,[] continuing contracts," and faculty recruitment -- the very topics addressed in the Law School Bylaws (*see, e.g.*, PX 7 at 181, 201–02).  Traster provides no evidence that the Board ever directed any college to design its own faculty dismissal processes.

Nor does Article III's title, "Educational Policy," authorize a Law School-specific dismissal process (*id*. at 129).  The design of dismissal procedures is not an "educational policy," similar to a faculty research assistant policy (PX 18) or policies to promote faculty scholarship (PX 19).  Dismissal procedures go to the heart of the University's relationship with its employees.

The other Faculty Constitution provision referenced by Traster, Article IX, is no more helpful.  Article IX empowers the University Faculty to adopt bylaws "necessary for the proper conduct and regulation of its business," so long as those bylaws do not conflict with the Faculty Constitution (PX

11

7 at 134 (Art. IX, § 1)).  The University Faculty has used this authority only to structure meetings of the University Faculty (*id*. at 136 (Faculty Bylaws 1 & 2)) and the University Council (*id*. at 136 (Faculty Bylaw 3)), and to create University-wide committees (*id*. at 137–46 (Faculty Bylaws 3–7)). The University Faculty's "business" does not extend to independently adopting policy, and the committees established by the Faculty Bylaws are no different; they sit only to recommend policy changes to the University Council and the Board, and implement existing university policy (*id*. at 137 (Faculty Bylaw 5)).  In the absence of another delegated power, Article III's delegation provision would only grant the law faculty this same limited power (Tr. at 109–10) (Provost Crago's explanation of how a University-wide suspension-with-pay policy would be adopted).

Traster also points to provisions of the Law School Constitution that, in his opinion, state the governing law faculty holds "fundamental governing power *at* the law school" (*id*. at 6) (emphasis added).  What the relevant provision in fact states is that the "[f]undamental governing power *of* the College of Law is vested in the governing faculty who may vote on all matters" (PX 3 at 4 (Art. I, § 2(D)) (emphasis added)).  This difference in prepositional phrases is subtle, but important.  Traster suggests that the law faculty has plenary power at the Law School, and therefore may decide the terms on which ONU may dismiss its employees.

His reading, granting more power to the law faculty than to the University Faculty, disregards the careful division of authority set forth in the Faculty Constitution -- no party suggests the University Faculty could amend Section 2.7 on its own.  Relevant Law School Constitution provisions are more plainly read to divide the authority vested in the College of Law between the law faculty on the one hand, and the Law School administration on the other.  The law faculty has "the power to decide all issues affecting the College of Law," except for "purely administrative decisions such as

12

budget and salary" (PX 3 at 5 (Art. I, § 2(H))), while the Dean and his or her staff are responsible for "daily administration of the Law School" (*id*. at 8 (Art. II, § 1)).

In sum, Traster fails to identify any feature of University structure authorizing the law faculty to adopt, on its own, a separate dismissal procedure for tenured law faculty. His reading of the pursuant-to clause is unreasonable, and implausible, in light of the context in which it was adopted.

***Purpose***. This Court construes contractual ambiguity in light of "the object intended to be accomplished" by the contracting parties. *Blosser*, 67 Ohio App. 3d at 219 (quotation marks and emphasis omitted). The purpose intended by the ONU employment contract was to provide qualified faculty members tenure and the academic freedom to express controversial views, while at the same time allowing ONU to end tenured appointments in exceptional circumstances (*see* PX 7 at 25 (§ 2.7(1)) ("Dismissal . . . shall not be used to restrain faculty members in the exercise of academic and artistic freedom.")). To protect academic freedom, the parties agreed to extensive procedural protections embodied in Handbook Section 2.7. Because this Section so closely resembles the process set forth in the AAUP Regulations, construing Traster's employment contract to contain only the Handbook procedure fits the parties' objective. The AAUP Regulations and Handbook Section 2.7 are near mirror images (*see* appendix).

Traster mostly points (Doc. 70 at 6) to differences between the two sets of rules that are insignificant when viewed in the context of all of Section 2.7's procedural protections, or which in fact are not clear differences at all. Traster was allowed to strike without cause only one hearing committee member, while under a framework that mirrored the Regulations, he could have struck two members. The Regulations recommend that the administration consult with the Faculty Committee on Academic Freedom and Tenure concerning whether and how to suspend a faculty member during

13

dismissal proceedings, while the Handbook contains no similar faculty advisory role.  Under both frameworks, however, suspension authority lies with the administration alone.

Traster also alleges that counsel's role differs substantially under the two sets of rules.  The Handbook expressly limits counsel's hearing role, while the Regulations do not.  Traster therefore concludes the Regulation-designed hearing committee cannot limit counsel's hearing role, but that conclusion does not necessarily follow.

Two Regulation recommendations that differ from parallel Handbook provisions -- the clear-and-convincing evidentiary burden and the prohibition on suspensions-without-pay -- are more significant, but a dismissal procedure that omits these features nonetheless achieves the parties' objective.

*Past Practice*.  Finally, this Court may "look to . . . past practice to aid in interpretation" of ambiguous contract language.  *Westgate Ford Truck Sales v. Ford Motor Co.*, 25 N.E.3d 410, 416 (Ct. App. 2014).

Past practice weighs against Traster's view of the interaction between the Handbook and the Bylaws.  Though Traster sat on the Tenure Committee for more than three decades, he cannot recall the Committee ever presiding over disciplinary proceedings (Tr. at 41–42).  Provost David Crago, who has held Law School tenure since 1997, also cannot recall the Committee involved in disciplinary proceedings (*id*. at 104).  Traster testified that at least some Committee members knew of his Section dismissal proceedings (*id*. at 49–50), but no Committee member petitioned ONU to transfer Traster's case to the Committee (*id*. at 81).  Not even Traster presents evidence that he asked the hearing committee for such a transfer (*see* PX 8–15), and he cannot recall when he first believed that the wrong committee had heard his case (Tr. at 35–36).

14

Further, Traster presented no evidence that any of ONU's colleges has weighed a faculty member's dismissal under a college-specific dismissal framework.  Traster is one of two ONU faculty members disciplined under the sexual harassment policy during current ONU President Daniel DiBiasio's tenure.  The second faculty member, a former College of Arts & Sciences instructor, was disciplined under the Handbook and not according to his college's bylaws (*id*. at 81).

Traster agrees that the University sexual harassment policy was properly applied to his case, but at the same time argues the Tenure Committee should have presided over application of that policy, not the Faculty Grievance Committee (*id*. at 32).  But the sexual harassment policy itself calls for the Faculty Grievance Committee to handle sexual harassment complaints (PX 7 at 48 (§ 2.25(5)(B))), and there is no precedent for such a selective application of only parts of the sexual harassment policy.

Finally, Traster presents no evidence that the AAUP, the ABA, or AALS has ever complained that Section 2.7 so lacks procedural protections that ONU fails to protect the academic freedom of faculty members who are considered for dismissal.  In its most recent survey of the Law School's compliance with ABA standards, the ABA continued the Law School's accreditation, noting no issues with ONU's faculty dismissal processes (DX 35).  In fact, the ABA found that "[a]ll members of the law faculty . . . are covered by the University policy on academic freedom, which is essentially similar to the AAUP 1940 Statement on Academic Freedom and Tenure" (DX 35 at 13).  The AAUP's 1940 Statement serves as the basis for the ABA, AAUP, and AALS standards referenced in the pursuant-to clause (*see* PX 6 at 1; DX 34 at 163 n.*; *Traster v. Ohio Northern University*, Case No. 3:12-cv-02966, Doc. 1-3 at 277 (N.D. Ohio 2012)).

***Summary***.  Contract text and structure, context, the parties' objectives, and past practice all show that Traster was entitled to only the dismissal process set forth in the Handbook.  The

pursuant-to clause confirms that, in the absence of dismissal proceedings, held according to procedures that are consistent with ABA, AAUP, and AALS guidance, a tenured faculty member's appointment continues and is not subject to any periodic retention review by the Law School. Traster's contrary reading invalidates entire sections of the Handbook and substitutes for those sections a procedure that Traster fails to show the law faculty had the power to adopt, that has never been used by the Law School to discipline tenured faculty, and that the law faculty itself did not insist on employing in Traster's case.  "No provision of a contract [should] be disregarded as inconsistent with other provisions, unless no other reasonable construction is possible." *Broad St. Energy Co.*, 975 F. Supp. 2d at 884 (quotation marks omitted).  Because a reasonable construction gives effect to both Handbook Section 2.7 and the pursuant-to clause, this Court concludes Traster's employment contract allowed him the procedure set forth in Section 2.7 only.  ONU therefore did not breach Traster's employment contract by applying the Handbook to his case.

### ONU's Departure from the Handbook is not a Breach of Contract

Traster generally concedes that ONU afforded him the process called for in the Handbook (Doc. 70 at 2).  That concession has one qualification: "ONU wrongfully suspended Professor Traster . . . [when it] made no finding of immediate harm as required under both the Faculty Handbook and the Bylaws" (*id.* at 9).  Traster here refers to Handbook Section 2.7(14) (PX at 7 at 27):

> Until final decision upon termination of an appointment, the faculty member will be suspended or assigned to other duties in lieu of suspension by the President only if immediate harm to the faculty member, to others, or the instructional program of [ONU] is threatened by the faculty member's continuance.

ONU responds that it did not suspend Traster under Section 2.7(14); it used Section 2.10, which grants the Administration "the right to discipline faculty members for just cause," allowing penalties to range from "oral reprimand to immediate discharge" (*id*. at 31).

16

ONU was bound to follow Section 2.7(14), not Section 2.10.  Provost Crago testified Section 2.7(14) did not apply because, at the time ONU made its suspension decision, it was not considering Traster's termination (Tr. at 109–12; *see also* Doc. 69 at 6–8).  Yet in his March 16, 2012 suspension letter, Crago told Traster that, if true, the sexual harassment complaints "warrant your dismissal" (Doc. 70-1 at 1).  ONU plainly was considering Traster's dismissal when it suspended him.  Therefore, as ONU concedes, "Section 2.7(14) would be relevant in the event that dismissal was intended at the time of the initial suspension" (Doc. 69 at 6).

But ONU says while that provision is relevant, no immediate-harm finding was necessary in Traster's case, because Section 2.10 is an alternative basis for suspending a faculty member (*id.* at 7).  This Court rejects that argument.  Section 2.10 might justify suspension as a sanction for misconduct, but Traster was not suspended as a sanction following a just-cause determination.  He was suspended in advance of being sanctioned by ONU, while ONU was expressly considering his dismissal, and because ONU's administration worried Traster's presence on campus was harmful to others and the University environment.  Section 2.10 itself permits a faculty member in Traster's position "the recourse provided in" Section 2.7 "as the exclusive remedy" (PX 7 at 31), and the immediate-harm provision is part of Section 2.7.  "[A] court must give meaning to all provisions of a contract if possible."  *Vill. Station Assoc. v. Geauga Co.*, 84 Ohio App. 3d 448, 452 (1992).

Therefore, ONU could have suspended Traster prior to the outcome of dismissal proceedings only if ONU concluded his continued presence posed a threat of immediate harm to others.  Traster argues ONU breached this provision because President DiBiasio testified he made no such finding.

"Nominal, trifling, or technical departures from the terms of a contract are not sufficient to breach it."  *Burlington Res. Oil & Gas Co. v. Cox*, 133 Ohio App. 3d 543, 548 (1999).  "A party does not breach a contract if it substantially performs the terms of the contract, even if performance does

17

not conform exactly to the plain language of the contract," *Baile-Bairead, LLC v. Magnum Land Servs., LLC*, 19 F. Supp. 3d 760, 767 (S.D. Ohio 2014) (quotation marks omitted), and "there is substantial performance upon one side when such performance does not result in any wrongful substantial injury to the other side," *Ohio Farmers Ins. Co. v. Cochran*, 104 Ohio St. 427, 434 (1922).

Traster presents no evidence disputing ONU's contention that it suspended him because of the gravity of the allegations made against him, which "rang[ed] from harassment to assault" (Doc. 70-1 at 1). President DiBiasio suspended Traster because of what he "learned about the nature of the physical sexual contact with the staff member and the less severe but nonetheless still unwelcome contact with the student, that those two together and, in particular, the nature of the physical assault led to the belief and the outcome that we suspended Professor Traster without pay" (Doc. 41 at 43; *see also* Tr. at 67). President DiBiasio worried that such assaults could happen again (Tr. at 67). Provost Crago testified that he had concluded Traster posed a threat of immediate harm to others. He gave particular weight to the Law School Employee's allegations, that Employee felt "extremely uncomfortable" around Traster, and that Law Student worried "Professor Traster was going to continue to behave in the way he behaved with her" (Doc. 40 at 88–91). President DiBiasio may not have invoked the words "immediate harm," and Provost Crago may not have "compartmentalized" his decision in that way (*id*. at 88), but the basis for their decision is substantially the same as such a finding.

The immediate-harm provision is intended to prevent hasty, ill-considered, or punitive suspensions prior to a final determination of adequate cause. Traster disagrees with ONU's basis for its suspension decision, but he has not shown that ONU entered its suspension decision without consideration of the immediate-harm provision's fundamental purpose. Given the grave allegations Traster faced, particularly with respect to the Law School Employee, he has not shown the absence

18

of a particularized immediate-harm finding "result[ed] in any wrongful substantial injury" that would not have occurred if ONU had considered making such a particularized finding.  *Ohio Farmers Ins. Co.*, 104 Ohio St. at 434.  Traster has at most shown a "[n]ominal, trifling, or technical departure[] from the terms of [the] contract," *Burlington Res. Oil & Gas Co.*, 133 Ohio App. 3d at 548, but not a breach of the contract.

### ONU's Decision to Terminate Traster is Supported by Substantial Evidence

ONU did not breach Traster's employment contract by affording him only those procedures set forth in the Handbook, and Traster presents no evidence showing a material breach of Section 2.7(14).  Because the Handbook alone applies, Traster is not entitled to suspension-without-pay damages.  That leaves Traster's "challeng[e to] ONU's findings reached during the 2012–13 proceedings," specifically, whether "ONU's basis for terminating Traster is . . . 'just cause' within the meaning of the contract" (Doc. 62 at 2).

"When the parties' contract defines the procedure to be used to determine termination of a tenured professor's contract at a private university, the standard of review is whether the contract and the United States Constitution have been adhered to, and whether there is substantial evidence in the record to support the termination."  *Brahim v. Ohio Coll. of Pediatric Med.*, 99 Ohio App. 3d 479, 487 (1994) (quotation marks omitted).  Substantial evidence review is limited to the record assembled by the university.  *See Yackshaw v. John Carroll Univ. Bd. of Trustees*, 89 Ohio App. 3d 237, 242 (1993).

On this standard, Traster cannot possibly show that ONU's termination decision lacks an adequate basis in the record.  The Hearing Committee on the Dismissal of Faculty heard testimony from law student and employee describing Traster's alleged sexually harassing behavior (*see, e.g.*, Doc. 24-2 at 101–111, 240–56).  The Hearing Committee credited this testimony (DX 41), and this Court must generally defer to those credibility determinations, *cf. Univ. of Cincinnati v. Conrad*, 63

19

Ohio St. 2d 108, 111 (1980) (per curiam).  Having credited this testimony, the Board's decision to terminate Traster for violations of the sexual harassment policy rested on reliable, probative, and substantial evidence.

### CONCLUSION

For these reasons, this Court concludes ONU did not breach its employment contract with Traster by suspending him without pay and then subjecting him to dismissal procedures under Handbook Section 2.7.  ONU's decision to terminate Traster is supported by substantial evidence. ONU is entitled to judgment on Traster's breach of contract claim, with no remaining claims.

IT IS SO ORDERED.

*s/ Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

December 18, 2015